**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

BRANDONLYN NUNLEY, Individually
and as Parent of TJN, a Minor,

       Plaintiff,

vs.

NICHOLAS J. ERDMANN,

       Defendant.

No. C14-4016-CJW

**ORDER**

---

*TABLE OF CONTENTS*

I.      **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

II.     **PROCEDURAL HISTORY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

III.   **SUMMARY JUDGMENT STANDARD.** . . . . . . . . . . . . . . . . . . . . *2*

IV.   **RELEVANT FACTUAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . *4*

V.    **ANALYSIS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

     A.    *Civil Rights Claims under 42 U.S.C. § 1983.* . . . . . . . . . . . . . . *13*
     B.    *Failure to Properly Respond.* . . . . . . . . . . . . . . . . . . . . . . . *15*
     C.    *Contentions Regarding Excessive Force Claim.* . . . . . . . . . . . . . *17*
     D.    *Other Argument.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*

VI.   **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *21*

## I.  INTRODUCTION

The matter before the court is Defendant Nicholas J. Erdmann's motion for summary judgment (Doc. 52). Proceeding pro se, Plaintiff Brandonlyn Nunley filed a resistance (Doc. 55), and Erdmann filed a reply (Doc. 56). Neither party requested oral argument, and, in any event, oral argument is not necessary. The motion for summary judgment is fully submitted.

## II. PROCEDURAL HISTORY

Nunley commenced this lawsuit on February 28, 2014. As directed by the court, the clerk's office filed Nunley's complaint (Doc. 4) on April 24, 2014. The court dismissed many of Nunley's claims (Doc. 30) on December 23, 2014. Although the court granted Nunley permission to file an amended complaint (Doc. 31), Nunley opted not to do so. Consequently, the only remaining claim is count 3, that is, a § 1983 claim alleging excessive force (Doc. 32).[1] Erdmann filed his motion for summary judgment (Doc. 52) on December 18, 2015. Nunley filed her resistance (Doc. 55) on February 1, 2016. Erdmann filed his reply (Doc. 56) on February 5, 2016.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948-49 (8th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Thus, "the substantive law will identify which facts are material." *Schilf*, 687 F.3d at 949 (quoting *Anderson*, 477 U.S. at 248) (internal quotation mark omitted). "To establish a genuine issue of material fact, [a party] may not 'merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [his or her] favor.'" *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013) (quoting *Davidson & Assocs. v.*

---

[1] The court notes that Erdmann did not file a timely answer and the parties proceeded as if a timely answer had been filed (Doc. 31, 33, 34, 35, 37 & 55). Despite the fact that Erdmann filed an answer (Doc. 51) on November 18, 2015, or well beyond the time that is permitted by Federal Rule of Civil Procedure 12, the court need not concern itself with such procedural irregularity because neither party raises it as an issue and Nunley is proceeding under 28 U.S.C. § 1915, which requires the court to dismiss a case at any time if it determines that a plaintiff's action fails to state a claim upon which relief can be granted.

*Jung*, 422 F.3d 630, 638 (8th Cir. 2005)). Typically, the moving party must support its motion by using "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," to show that there is no genuine issue of material fact before the court. Fed. R. Civ. P. 56(c)(1)(A). Since a "'party's own testimony is often self-serving,'" all "particular factual allegations [must be] scrutinized for 'independent documentary evidence'" to be considered legally competent. *Argenyi*, 703 F.3d at 446 (citations omitted).

The court must view all "the evidence in the light most favorable to the nonmoving party and giv[e] the nonmoving party the benefit of all reasonable inferences." *Crawford v. Van Buren Cty., Ark.*, 678 F.3d 666, 669 (8th Cir. 2012) (citing *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1035 (8th Cir. 2010)). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In order to deny a motion for summary judgment, "the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (quoting *Anderson*, 477 U.S. at 248 (1986)).

Procedurally, "[a] movant for summary judgment . . . must identify those portions of the record which . . . demonstrate the absence of a genuine issue of material fact." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). If the moving party has done so, then the nonmoving party "must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* at 794. (citing *Torgerson*, 643 F.3d at 1042). "Speculation and conjecture are insufficient . . . ." *Id.* (citing *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir.

2006)). If the record, viewed as a whole, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 792. (citing *Torgerson*, 643 F.3d at 1042). Throughout the summary judgment stage, "the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." *Schilf*, 687 F.3d at 949 (citing *Anderson*, 477 U.S. at 249).

## IV.  RELEVANT FACTUAL BACKGROUND

On September 16, 2012, Erdmann, an Iowa State Patrol Trooper, drove his patrol car west on Highway 10. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 1; App'x, Affidavit (Doc. 52-3) at ¶¶ 1-2; App'x, Video (Doc. 52-3). While driving through Paullina, Iowa, Erdmann observed a Dodge Caravan traveling East on Highway 10. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 1; App'x, Affidavit (Doc. 52-3) at ¶ 2; App'x, Video (Doc. 52-3). He observed that the window of the Dodge Caravan was down and the driver of the Dodge Caravan did not have her seat belt fastened. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 1; App'x, Affidavit (Doc. 52-3) at ¶ 2; App'x, Video (Doc. 52-3). Erdmann turned his car around, activated the lights of his patrol car, attempted to call in the license plate, and stopped the Dodge Caravan. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 2; App'x, Affidavit (Doc. 52-3) at ¶¶ 2-3; App'x, Video (Doc. 52-3). Erdmann approached the passenger side of the Dodge Caravan and told the driver that he stopped her because she was not wearing her seat belt. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 3; App'x, Affidavit (Doc. 52-3) at ¶ 3; App'x, Video (Doc. 52-3).

The driver of the Dodge Caravan, Nunley, told Erdmann that she was wearing her seat belt. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 3; App'x, Affidavit (Doc. 52-3) at ¶ 3; App'x, Video (Doc. 52-3). In response, Erdmann

4

stated that she did not have her seat belt on when he met her on the road and she put it on after he turned his patrol car around. *See* App'x, Video (Doc. 52-3). Erdmann saw that Nunley had a small child with her. *Id*. Erdmann asked Nunley for her driver's license, vehicle's registration, and insurance. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 4; App'x, Affidavit (Doc. 52-3) at ¶ 3; App'x, Video (Doc. 52-3). Nunley provided proof of registration and insurance but told Erdmann that she did not have her license with her, that it was at home, and that the Dodge Caravan belonged to her friend, Steve Ludwig. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 5; App'x, Affidavit (Doc. 52-3) at ¶¶ 3-4; App'x, Video (Doc. 52-3). The Dodge Caravan was not registered in Nunley's name. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 6. In response to Erdmann's additional question about why she did not have her seat belt fastened, Nunley acknowledged that she had just left her parents' home and then put it on. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 3; App'x, Video (Doc. 52-3).

Erdmann asked Nunley if she had identification of any kind, such as a checkbook. *See* App'x, Video (Doc. 52-3). Nunley stated that she did not have such identification but could provide her date of birth and social security number. *Id*. She also told Erdmann that she did not have an Iowa license, she had a Nebraska license, and she had not changed her driver's license even though she had been living in Iowa since 2011. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 5; App'x, Affidavit (Doc. 52-3) at ¶ 3; App'x, Video (Doc. 52-3). To explain why she had not updated her license, Nunley stated that she planned to return to Nebraska and that she was fighting for her boys in Iowa. *See* App'x, Video (Doc. 52-3).

Erdmann asked Nunley for her name, age, and social security number. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 7; App'x, Video (Doc. 52-3). When Erdmann asked Nunley about her age, Nunley said she was 33 and then quickly stated that she was 34. *See* Erdmann's Statement of Undisputed Material

Facts (Doc. 52-1) at ¶ 7; App'x, Video (Doc. 52-3). Nunley provided her date of birth and again maintained that she was 34 until Erdmann stated that a birth on January 7, 1979, corresponded with an age of 33. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 7; App'x, Video (Doc. 52-3). In response to Erdmann's assertion that things were not adding up, Nunley stated that she could be 33, that she told her friend that she was 34 and that she was not counting the years. *See* App'x, Video (Doc. 52-3). She also stated that the date of birth and other information that she provided were correct. *Id*.

Erdmann did not know whether Nunley had provided him with a false name because Nunley was extremely nervous and should have been 33 years old based on the date of birth she provided. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 8; App'x, Affidavit (Doc. 52-3) at ¶ 4. Erdmann asked Nunley if her young child would be okay if she came back to his car, and Nunley indicated that he would be okay. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 9; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3). While going back to Erdmann's car, Nunley changed her mind, apologized, got back into her car and told Erdmann that she did not feel safe going back to his car. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 10; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3). Erdmann followed Nunley back to her car and could see a hammer in plain view under the driver's seat of the Dodge Caravan. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 11; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3).

In order to verify the information that Nunley provided, Erdmann asked Nunley to call the owner of the Dodge Caravan so that he could talk to him, and she attempted to do so. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 12; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3). Erdmann held his hand out to obtain Nunley's phone, Erdmann moved closer to obtain Nunley's phone, Nunley told Erdmann "hold on," Erdmann told Nunley "nope, nope," Nunley again told Erdmann

"hold on," Erdmann told Nunley "stop," and Erdmann took the phone out of Nunley's hand because he did not want Nunley to provide any information to the person she was calling. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 13; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3). As Erdmann took the phone from her, Nunley grabbed Erdmann's wrist, Erdmann told Nunley that she was making him uncomfortable, and Erdmann responded "okay, go ahead." *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 14; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3). Nunley asked Erdmann what he was doing and acknowledged that Erdmann muted her phone. *See* App'x, Video (Doc. 52-3). No one answered the phone. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 15; App'x, Affidavit (Doc. 52-3) at ¶ 5; App'x, Video (Doc. 52-3).

Nunley asked if she could call her parents. *See* App'x, Video (Doc. 52-3). After he declined to allow Nunley to call her parents, Erdmann stated that Nunley was making him nervous. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 29; App'x, Video (Doc. 52-3). In response, Nunley stated that she was disabled and scared; Erdmann responded that Nunley was acting more than being a little bit scared, that something did not seem right, and that he did not want a lot of people to come there. *See* App'x, Video (Doc. 52-3). Erdmann then told Nunley that he was going to have her come to the back of her car and that he would not have her sit in his patrol car if that made her uncomfortable. *See* App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). In response, Nunley said that she did not want to get out of her car and asked Erdmann to return her phone. *See* App'x, Video (Doc. 52-3). When Erdmann said that he was going to hang on to her phone, Nunley started to scream for her dad, who was down the road at Mill Creek. *See* App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann repeatedly told Nunley to relax. *See* App'x, Video (Doc. 52-3). After Erdmann told Nunley to stand behind her car, Nunley closed her door. *See* Erdmann's Statement

of Undisputed Material Facts (Doc. 52-1) at ¶ 16; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3).

Erdmann asked Nunley if she would at least give him the keys to her car. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 18; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). In response, Nunley locked the door, turned the ignition, and started to roll the window up. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 18; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann thought Nunley was going to flee and was especially concerned because a child was in the car. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 19; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann then repeatedly told Nunley to "stop"; he then reached in, unlocked the door, and opened it. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 19; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Nunley stated "no, no, no, no this is not legal." *See* App'x, Video (Doc. 52-3).

While holding the door open, Erdmann stepped back from Nunley's car and radioed to see if an officer from Paullina could assist. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 17; App'x, Video (Doc. 52-3). When Erdmann was seeking assistance, Nunley got out of her car and lunged at Erdmann's left side in an attempt to grab her phone or the paperwork that Erdmann was holding. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 20; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Nunley then screamed for her dad, and she turned her back to Erdmann. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 21; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3).

Erdmann calmly approached Nunley and told Nunley to "come here" a couple of times. *See* App'x, Video (Doc. 52-3). As Nunley had her back turned, Erdmann attempted to guide Nunley to the back of her car with his right hand because Nunley's

phone and paperwork were in his left hand. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 22; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Nunley tried to pull away from Erdmann and pushed Erdmann. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 22; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). In response, Erdmann wrapped his arms around Nunley and took her to the ground. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 22; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). While Erdmann and Nunley were on the ground and near the edge of the highway, Erdmann repeatedly told Nunley to put her hands behind her back. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 23; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Although she said "okay, okay," Nunley did not put both of her hands behind her back or remain still. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 23; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3).

Erdmann again tried to radio for help. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 24; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann was able to gain control of Nunley's left hand, but Nunley freed it and appeared to be reaching toward her left pocket. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 25; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann repeatedly told Nunley not to reach and to lie on her stomach. *See* App'x, Video (Doc. 52-3). In response, Nunley repeatedly screamed for her dad and for help. *Id*. While Nunley was on her side and stomach, Erdmann repeatedly told Nunley to put her hands behind her back. *See* App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Nunley did not do so. *See* App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3).

Erdmann ultimately cuffed Nunley's left hand, but Erdmann was unable to cuff Nunley's right hand because she tucked it under her body, tensed up and was strong. *See*

Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶¶ 26-27; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann continued to order Nunley to put her hands behind her back, but she refused to do so. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 28; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Ultimately, Erdmann gained control of Nunley's right hand and placed her in handcuffs with the assistance of an unidentified citizen. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 30; App'x, Affidavit (Doc. 52-3) at ¶ 6; App'x, Video (Doc. 52-3). Erdmann thanked the citizen, who asked Erdmann if he was okay. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 30; App'x, Video (Doc. 52-3). Erdmann indicated he was okay. *See* App'x, Video (Doc. 52-3). Once placed in handcuffs, Nunley relaxed. *Id*.

While resisting arrest, Nunley scraped the left side of her face and the back of her right hand. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 34; App'x, Video (Doc. 52-3). While trying to control Nunley, Erdmann cut his knuckles on his left hand and jammed his right thumb. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 39; App'x, Video (Doc. 52-3).

Erdmann held on to the back of Nunley's right arm and told her to stand up and to place her feet under her. *See* App'x, Video (Doc. 52-3). Erdmann assisted Nunley by moving her feet under her. *Id*. Nunley stood up on her own. *Id*. As directed by Erdmann, Nunley calmly walked over to Erdmann's patrol car and sat on the front bumper of Erdmann's patrol car. *Id*. Erdmann opened and closed his left hand. *Id*. Nunley asked Erdmann to retrieve her paperwork and phone. *Id*. Erdmann told Nunley not to worry and informed her that she would get everything back. *Id*. Erdmann asked Nunley what she had in her front left pocket because she reached for something. *Id*. Nunley said that she did not have anything in her left pocket, and Erdmann did not find anything in it. *Id*. Erdmann continued to tell Nunley to relax. *Id*.

An officer from the Paullina Police Department arrived at the scene. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 31; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3). Nunley was placed in the Paullina police officer's vehicle. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 32; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3). Erdmann asked the Paullina police officer if he knew Nunley. *See* App'x, Video (Doc. 52-3). The Paullina police officer asked what her name was, and Erdmann said that was part of the problem. *Id*. The Paullina police officer worked with Nunley to make arrangements for her child and vehicle. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 32; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3).

Erdmann returned to his patrol car, ran the license plate of the Dodge Caravan, and checked the information that Nunley provided. *See* App'x, Video (Doc. 52-3). The information that Nunley provided to Erdmann checked out. *Id*. While in his patrol car and talking to another Iowa State Patrol Trooper who arrived at the scene to assist, Erdmann acknowledged that he had three or four scrapes. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 35; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3). The other Iowa State Patrol Trooper checked on Nunley's child when Erdmann went to check on Nunley. *See* App'x, Video (Doc. 52-3). The Paullina police officer informed Erdmann that Nunley's mother was on her way. *Id*. Erdmann inquired whether Nunley had requested an ambulance. *Id*.

While speaking on a phone with the owner of the Dodge Caravan, Nunley provided him a phone number, acknowledged that she was in handcuffs because she was uncooperative and scared, told him that she was in the back of a police car, admitted that she was not wearing a seat belt, indicated that her child was in the car and her mother was coming to get him, indicated that she did not know whether she would be permitted to drive the Dodge Caravan, and asked him to speak with Erdmann. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 33; App'x, Video (Doc. 52-3).

When Erdmann asked if she needed an ambulance for the scrape on her head, Nunley said that she did. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 34; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3). Proceeding according to policy, Erdmann arranged for an ambulance to come to the scene. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 34; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3). Pursuant to Nunley's request, Erdmann briefly spoke with the owner of the Dodge Caravan. *See* App'x, Video (Doc. 52-3).

Nunley's parents arrived to take custody of Nunley's child and vehicle. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 32; App'x, Affidavit (Doc. 52-3) at ¶ 7; App'x, Video (Doc. 52-3). After checking on Nunley's child, the other Iowa State Patrol Trooper never left Nunley's child until Nunley's father took custody of the child. *See* App'x, Video (Doc. 52-3). An ambulance arrived, and a paramedic cleaned Nunley's scrapes, which another officer described as tiny and less severe than the scrapes that Erdmann suffered. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 36; App'x, Affidavit (Doc. 52-3) at ¶ 8; App'x, Video (Doc. 52-3). After providing treatment to Nunley, a paramedic indicated that Nunley could be transported to the O'Brien County Jail. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 36; App'x, Affidavit (Doc. 52-3) at ¶ 8. Nunley did not request any further medical treatment. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 36; App'x, Affidavit (Doc. 52-3) at ¶ 8.

An O'Brien County Sheriff Deputy transported Nunley to the O'Brien County Jail. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 37; App'x, Affidavit (Doc. 52-3) at ¶ 8; App'x, Video (Doc. 52-3). At the O'Brien County Jail, Erdmann photographed the scrapes on Nunley's face and hand. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 38; App'x, Affidavit (Doc. 52-3) at ¶ 9; App'x, Photos (Doc. 52-3) at 7-8. He also photographed the scrapes on his left hand. *See*

Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 38; App'x, Affidavit (Doc. 52-3) at ¶ 9; App'x, Photo (Doc. 52-3) at 9.

Nunley was charged with interference with official acts causing injury and failure to wear a seat belt. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 40; App'x, Affidavit (Doc. 52-3) at ¶ 10; App'x, State Record (Doc. 52-3) at 10-12; App'x, Video (Doc. 52-3). Nunley was convicted of the seat belt infraction, and the O'Brien County Attorney dismissed the charge of interference with official acts causing injury. *See* Erdmann's Statement of Undisputed Material Facts (Doc. 52-1) at ¶ 41; App'x, State Record (Doc. 52-3) at 10-12.

## *V.  ANALYSIS*

Nunley contends that Erdmann's actions on September 16, 2012, amounted to a civil rights violation under 42 U.S.C. § 1983. Specifically, Nunley alleges a violation of her right to be free from the use of excessive force.

### *A.  Civil Rights Claims under 42 U.S.C. § 1983*

Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Such statute was designed to provide "a broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, 42 U.S.C. § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989);

*Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "[O]ne cannot go into court and claim a 'violation of [42 U.S.C.] § 1983'—for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, 42 U.S.C. § 1983 provides a remedy for violations of the "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (stating that 42 U.S.C. § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'"); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (noting that the phrase "Constitution and laws" means that 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statutes, as well as those created by the Constitution). Thus, "[t]o state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution [or] laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011) ("To state a claim under § 1983, a plaintiff must allege (1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right.").

In response to a claim under 42 U.S.C. § 1983, a defendant may assert the defense of qualified immunity. The Eighth Circuit has explained that:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties;

> these claims do not require proof of any policy and qualified
> immunity may be raised as a defense.

*Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citations omitted). "The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates 'clearly established statutory or constitutional rights.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Officials are entitled to qualified immunity only to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (quoting *Harlow*, 457 U.S. at 818). "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)) (internal quotation marks omitted). When analyzing qualified immunity, the Eighth Circuit has instructed district courts to conduct a two-part inquiry:

> The court must first consider the threshold inquiry of whether
> the facts alleged, taken in the light most favorable to the party
> asserting the injury, show the defendant['s] conduct violated a
> constitutional right. If a constitutional right has not been
> violated, it is unnecessary to inquire further regarding
> qualified immunity. If a violation could be established on the
> facts alleged, the second inquiry is whether the right was
> clearly established at the time the violation occurred.

*Id.* (citations omitted).

### B. Failure to Properly Respond

Nunley filed a resistance. But, Erdmann correctly points out that Nunley's resistance is not proper because she did not respond to his statement of material facts,

provide an additional statement of material facts, provide legal authority to support her assertions, or authenticate materials in the record. Indeed, Nunley did not expressly admit, deny, or qualify each of the facts set forth in the statement of undisputed material facts that Erdmann attached to his motion for summary judgment. *See* LR 56.b.2. Nunley's failure to file a proper response to Erdmann's statement of undisputed material facts constitutes an admission of each of these facts. *See* LR 56.b.; *accord* Fed. R. Civ. P. 56(e)(2)-(4) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion, . . . grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it . . . or . . . issue any other appropriate order").

Because Nunley did not file a proper resistance and did not request additional time to respond, it is appropriate to consider the merits of Erdmann's motion for summary judgment without waiting any longer for Nunley to furnish evidence, citations, or other reasons for denying it. *See Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir. 1993) ("Even if a motion for summary judgment . . . stands unopposed, the . . . court must still determine that the moving party is entitled to judgment as a matter of law . . . ."); *cf. Johnson v. Boyd-Richardson Co.*, 650 F.2d 147, 149 (8th Cir. 1981) (requiring court to "inquire into the merits of [a motion to dismiss] and to grant or deny it, as the case may be, in accordance with the law and the relevant facts"). In light of Nunley's admission of the facts included in Erdmann's statement of undisputed material facts, the court concludes that Erdmann is entitled to summary judgment. It is appropriate to grant summary judgment in favor of Erdmann for the reasons stated in Erdmann's brief. Erdmann adequately sets forth the law and applies such law to the undisputed material facts. Given Nunley's nearly complete failure to come forward with any evidence or relevant legal authority, Erdmann is entitled to judgment as a matter of

law with respect to Nunley's excessive force claim. The record, even when viewed in the light most favorable to Nunley, fails to establish a genuine issue of material fact with regard to whether Erdmann violated Nunley's constitutional rights and whether Erdmann is entitled to qualified immunity.

### C. Contentions Regarding Excessive Force Claim

> Claims that [a] law enforcement officer[] used excessive force during an arrest or investigatory stop are analyzed under the Fourth Amendment's prohibition of unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). When determining whether unreasonable force was used, courts must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer[] or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. Courts should not allow "the 20/20 vision of hindsight" to cloud "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97. In other words, to comport with the Fourth Amendment, the force must have been objectively reasonable in light of the facts and circumstances confronting the officer[] at the time it was used. *Id*. at 397. Courts should not consider the officer['s] subjective motivations when determining whether [the officer's] use of force was reasonable under the Fourth Amendment. *Id*. at 397-98.

*Schoettle v. Jefferson Cty.*, 788 F.3d 855, 858-61 (8th Cir. 2015) (parallel citations omitted); *see also Grider v. Bowling*, 785 F.3d 1248, 1251-53 (8th Cir. 2015) ("The dispositive question is whether the officer's conduct was objectively reasonable under the circumstances, as judged from the perspective of a reasonable officer on the scene at the time the force was applied."); *Ziesmer v. Hagen*, 785 F.3d 1233, 1237-39 (8th Cir. 2015)

(discussing proof of injury); *Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014) (analyzing excessive-force claim in the context of seizures under the Fourth Amendment and applying a reasonableness standard); *Peterson v. Kopp*, 754 F.3d 594, 600-01 (8th Cir. 2014) (same); *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) (same); *Rohrbough v. Hall*, 586 F.3d 582, 585-86 (8th Cir. 2009) (stating that the appropriate inquiry is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, which include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, whether the suspect actively resisted arrest or attempted to evade arrest by flight and the extent of the suspect's injuries).

Nunley's allegations regarding Erdmann's use of excessive force fail as a matter of law. The record, which includes the video evidence of the encounter involving Erdmann and Nunley, establishes beyond genuine dispute that Erdmann's actions do not rise to the level of a constitutional violation. Indeed, it establishes that: (1) Nunley falsely claimed that she had been wearing her seat belt; (2) Nunley did not have her Nebraska driver's license with her or any other type of identification with her; (3) the Dodge Caravan did not belong to Nunley; (4) Nunley provided inconsistent and suspicious information concerning her age; (5) Nunley was extremely nervous; (6) Nunley decided not to assist Erdmann by verifying her information; (7) Erdmann saw that Nunley had a hammer near her; (8) Erdmann took reasonable steps to verify Nunley's identity; (9) Nunley grabbed Erdmann while he was attempting to obtain her phone; (10) Nunley repeatedly refused to comply with Erdmann's reasonable and lawful requests; (11) even though she had a child with her, Nunley escalated the situation by screaming, shutting the door, locking the door, trying to roll up the window, getting out of the vehicle and lunging for her phone or paperwork, which were located near Erdmann's firearm; (12) after acting as if she was going to flee, Nunley again refused to comply with Erdmann's requests, pulled away from Erdmann,

pushed Erdmann, and physically struggled with Erdmann; (13) Erdmann took Nunley to the ground in a controlled manner; (14) Erdmann again tried to call for assistance; (15) Nunley repeatedly refused to comply with Erdmann's directives; (16) Nunley continued to struggle and posed a threat to herself and Erdmann given their proximity to the highway; (17) Erdmann used minimal force, even though Nunley refused to comply with Erdmann's directives, continued to struggle, and tried to reach for one of her pockets; (18) Erdmann gained control of Nunley without striking her or using pepper spray and placed handcuffs on her; (19) Erdmann calmly and appropriately assisted Nunley to her feet; (20) Nunley stopped screaming and cooperated with law enforcement officials after a concerned citizen assisted Erdmann; (21) arrangements were made for Nunley's child; and (22) Nunley received medical treatment before being transported to the O'Brien County Jail.

Those facts clearly demonstrate that Nunley behaved irrationally and failed to cooperate even though she did not have her seat belt fastened, did not have her driver's license with her, could not prove her identity, did not own the car that she was driving, and did not know how old she was. Rather than assist Erdmann, Nunley interfered with Erdmann's attempts to establish who Nunley claimed to be. The facts also demonstrate that Erdmann (1) repeatedly tried to accommodate Nunley, to put her at ease and to defuse her unjustified uneasiness, (2) diligently maintained his composure and professionalism even though Nunley became more uncooperative, unreasonable, and erratic and (3) steadfastly restrained himself as Nunley increasingly put Erdmann, herself, and her child in more danger. Erdmann applied no more force than was necessary to quickly and safely secure Nunley and to protect himself, Nunley, and Nunley's child. Because the force applied was no more than necessary, Nunley only suffered minor scrapes.

Nunley misstates the record, fails to support her factual assertions, and misapplies the law. Moreover, all of the *Graham* factors favor Erdmann because: (1) Nunley did not have her seat belt fastened; (2) Nunley did not provide any identification that would have

enabled Erdmann to quickly verify whether Nunley was lawfully driving the Dodge Caravan; (3) Nunley actively interfered with Erdmann's investigation; (4) Nunley acted in an unpredictable manner; (5) Nunley behaved as if she was going to flee; (6) Nunley posed an immediate threat to the safety of Erdmann, herself, and her child; and (7) Nunley actively resisted arrest. *See Schoettle*, 788 F.3d at 859-61 (determining officers did not use excessive force); *Simpson v. Kansas*, 593 F. App'x 790, 797 (10th Cir. 2014) (same); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 324-55 (rejecting distinctions between permissible and impermissible arrests). It is clear that Erdmann's use of force under all of the circumstances was objectively reasonable. Accordingly, the court finds that Erdmann is entitled to judgment as a matter of law.

### D. Other Argument

Having concluded that Erdmann is entitled to judgment as a matter of law because the record fails to establish a genuine issue of material fact with regard to whether Erdmann violated Nunley's constitutional rights, it is not necessary to review Erdmann's remaining contention that he is entitled to qualified immunity. Nonetheless, qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law," *Malley*, 475 U.S. at 341, and the record does not establish that it would have been clear to a reasonable officer that Erdmann's conduct was unlawful in the situation that he confronted, *see Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Plumhoff v. Rickard*, ___ U.S. ___, ___, 134 S. Ct. 2012, 2022-23 (2014) (addressing the defense of qualified immunity and emphasizing that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it"). This is especially so because Nunley incessantly refused to comply with Erdmann's reasonable requests, completely disregarded Erdmann's attempts to handle the matter in a professional manner, mindlessly

attended to her child, and doggedly behaved in an objectively bizarre, unsafe, and irrational manner until a concerned citizen stopped to assist Erdmann.

## VI. CONCLUSION

In light of the foregoing, Erdmann's motion for summary judgment (Doc. 52) is **granted**. The clerk's office is **directed** to enter judgment in favor of Erdmann and against Nunley. The clerk's office is also **directed** to close this case.

**IT IS SO ORDERED** this 21st day of March, 2016.

_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa